# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROBIN LEANN MOORE-BROWN )<br>*individually, and as Special Administrator of* )<br>*the Estate of Fred Norris Brown, III, et al.*, )<br>                                                      )<br>                    Plaintiffs,          )<br>          vs.                                )<br>                                                      )<br>CITY OF NORTH LAS VEGAS POLICE )<br>DEPARTMENT, *et al.*,                 )<br>                                                      )<br>                    Defendants.        )<br>_____) | Case No.: 2:20-cv-01649-GMN-VCF<br><br>**ORDER** |

Pending before the Court is the Motion for Summary Judgment, (ECF No. 27), filed by Defendants City of North Las Vegas ("the City"), City of North Las Vegas Police Department ("NLVPD"), and Officer Alexander Cuevas (collectively, "Defendants'").  Plaintiffs Robin Leann Moore-Brown, B. B. Brown, L. K. Brown, and L. L. Brown (collectively, "Plaintiffs") filed a Response, (ECF No. 31), and Defendants filed Reply, (ECF No. 35).

For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment.

## I.   BACKGROUND

This case arises from an officer-involved shooting resulting in the death of Mr. Fred Norris Brown III. (*See generally* Compl., ECF No. 1).  Plaintiff Mrs. Robin Moore-Brown is Mr. Brown's wife and the mother of Mr. Brown's three minor children, Plaintiffs B.B., L.K., and L.L. (*Id.* ¶¶ 4–5).  Officers Alexander Cuevas and Chastity Smith responded to an alleged domestic violence incident between Mr. Brown and Mrs. Moore-Brown, (Ex. H to Resp. at 5, ECF No. 31-7), during which Mr. Brown allegedly kicked and hit Mrs. Moore-Brown. (Ex. I to Mot. Summ. J. CNLV002125:47, CNLV002126:80–81, ECF No. 27-7).

The officers tried to convince Mrs. Moore-Brown to leave the apartment complex but Mrs. Moore-Brown, missing her phone and shoe, insisted on re-entering her apartment to retrieve her belongings. (Officer Smith's body worn camera ("BWC") video, Ex. B to Mot. Summ. J. 26:58–29:10). One of Mrs. Moore-Brown's children let her into the locked apartment and the officers followed her in. (*Id.*). Mrs. Moore-Brown had informed the officers that Mr. Brown had no weapons in the apartment. (*Id.*).

Mr. Brown was shot less than two minutes and fifteen seconds after the officers entered the apartment. (*See id.* 32:34-34:45). The sequence of events during the first minute the officers were inside the apartment are undisputed and clearly evident in the BWC footage: Upon entering the apartment, the officers immediately started calling to Mr. Brown, who did not initially respond. (*Id.*). Officer Smith, who had drawn her firearm, cleared the bathroom and bedrooms on the west side of the apartment while Officer Cuevas stood in the front room. (*Id.*). Mrs. Moore-Brown indicated to the officers that Mr. Brown was in the room on the opposite side of the apartment. (*Id.*). Officer Cuevas asked Mrs. Moore-Brown and her children to step outside. (*Id.*). Then, Officer Smith followed Officer Cuevas, who had also drawn his firearm, into the east bedroom. (*Id.*). Officer Cuevas directed his firearm tactical light at the floor to illuminate the dark bedroom. (*Id.*).

The officers first saw Mr. Brown about one minute and fifteen seconds before he was shot. (*Id.* 33:30–34:45). As discussed below, some facts of what transpired during this short interaction are in dispute. Nonetheless, the general sequence of events during this short period of time is undisputed.

When the officers first located Mr. Brown, he was lying on a bed. (*Id.*). The officers asked Mr. Brown to come out and talk to them, and then asked to see his hands. (*Id.*). Mr. Brown displayed his empty hands and asked, "What y'all doing?" (*Id.*). Officer Smith explained, "we got called here for you and your girlfriend." (*Id.*). Mr. Brown stood up and

said, "I ain't going to talk to y'all." (*Id.*).  At this time, Officer Cuevas and Officer Smith holstered their firearms and transitioned to their tasers. (Ex. A to Mot. Summ. J. at 23–24, ECF No. 27-1).

Mr. Brown moved towards the officers and put his hands up, saying "don't touch me" repeatedly. (Ex. B to Mot. Summ. J. 33:30–34:45).  At this point, there had been no physical contact between the officers and Mr. Brown and there remained several feet of space between them. (*Id.*).  As Mr. Brown and the officers moved into the front room, Mr. Brown's behavior escalated, repeating "don't touch me" and asking the officers, "what are y'all doing in my house?" (*Id.*).

Once out of the bedroom, Mr. Brown put his hands up again but did not keep them up. (*Id.*).  Mr. Brown, seen now in the light, was shirtless and wore jogging pants. (*Id.*).  No weapons were visible in his waistband. (*Id.*).  Mr. Brown was six foot three inches tall with a muscular build, and the BWC footage illustrates that he was much larger than both of the officers.[1] (*Id.*; Ex. A to Mot. Summ. J. at 2).  At this point, Officer Cuevas had holstered his taser and had both hands free, while Officer Smith continued to aim her taser at Mr. Brown. (Ex. B to Mot. Summ. J. 33:30–34:45).  Mr. Brown stood on a stack of cardboard as the verbal altercation continued and the officers called for backup. (*Id.*).

Mr. Brown stepped down from the stack of cardboard and walked into Officer Cuevas with his hands raised in the air. (*Id.*).  What happened next is in dispute.  According to Defendants, Officer Cuevas tried to grab Mr. Brown's hand and body, but Mr. Brown resisted and struck Officer Cuevas in the face with a closed fist. (Mot. Summ. J. 5:21–24).  According to Plaintiffs, Officer Cuevas put his arm around the back of Mr. Brown's neck and Mr. Brown did not punch, kick, or strike Officer Cuevas during this initial physical contact. (Resp. 5:16–

---

[1] Officer Cuevas is five foot five inches tall, and Officer Smith is five foot six inches tall. (Ex. A to Mot. Summ. J. at 10).

19).  Nonetheless, it is undisputed that Mr. Brown pushed the officers towards the doorway, Mr. Brown held Officer Cuevas in a headlock for a few seconds, and Mr. Brown and the officers ended up just outside the doorway to the apartment during the physical altercation. (Ex. B to Mot. Summ. J. 33:30–34:45).  At some point during the struggle, Officer Smith dropped her taser inside the apartment. (Ex. A to Mot. Summ. J. at 19).  At no point during the interaction did the officers tell Mr. Brown he was under arrest or verbally warn him that they would shoot him. (Ex. B to Mot. Summ. J. 33:30–34:45).

Officer Cuevas eventually got free from Mr. Brown's chokehold, but the parties dispute how this happened.  According to Plaintiffs, Mr. Brown voluntarily released Officer Cuevas. (Ex. H to Resp. 6:13–17).  Defendants merely state that Officer Cuevas got free for unknown reasons. (Resp. 7:5).  Nonetheless, it is undisputed that both Officer Cuevas and Mr. Brown were standing when Officer Cuevas broke free from Mr. Brown's chokehold. (Ex. B to Mot. Summ. J. 33:30–34:45).  Officer Cuevas stumbled and coughed as he recovered from the chokehold, but almost immediately turned to Mr. Brown, drew his firearm, and shot Mr. Brown three times. (*Id.*).  The third shot was fired just before Mr. Brown hit the ground. (*Id.*).  Mr. Brown sustained gunshot wounds to his abdomen, left flank, lower back, and right hand, (Ex. G to Resp., ECF No. 31-6), and did not respond to any lifesaving attempts, (Ex. A to Mot. Summ. J. at 24).  Officer Smith had her firearm drawn and aimed at Mr. Brown when he was shot but did not fire because she "didn't feel comfortable taking a shot without hurting Cuevas." (*Id.* at 20).

The parties further dispute what Mr. Brown was and was not doing in the moment before Officer Cuevas shot him.  According to Defendants, the officers believed that Mr. Brown might continue to attack the officers. (Mot. Summ. J. 7:10–14).  According to Plaintiffs, Mr. Brown was surrendering. (Resp. 1:22–26).

Plaintiffs filed a complaint in this Court asserting eight causes of action: (1) Fourth Amendment excessive force claim against Officer Cuevas; (2) Fourteenth Amendment substantive due process claim against Officer Cuevas; (3) municipal liability for unconstitutional custom or policy against the City and NLVPD; (4) municipal liability for failure to train against the City and NLVPD; (5) municipal liability for ratification against the City and NLVPD; (6) battery claim against all Defendants; (7) negligence claim against all Defendants; and (8) negligent infliction of emotional distress claim against all Defendants. (Compl. ¶¶ 27–128).  Plaintiffs request punitive damages from Officer Cuevas in their prayer for relief. (Compl. 23:3).  Defendants now move for summary judgment on all claims and the request for punitive damages. (Mot. Summ. J. 11:13–15).  Additionally, Defendants move for summary judgment on their defenses of Qualified Immunity and State Discretionary Immunity. (Mot. Summ. J. 19:4, 26:15–16).

## II.    <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253, 288–89 (1968)).  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd.*

*P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations and quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible

discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Orr v. Bank of America*, 285 F.3d 764, 783 (9th Cir. 2002). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.   DISCUSSION

The Court first addresses the federal claims and defense before turning to the state claims and defense and punitive damages. Plaintiffs bring their federal claims under 42 U.S.C. § 1983. (*See* Compl. at 1). Section 1983 actions involve the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To bring a successful § 1983 claim, a plaintiff must allege (1) a violation of a constitutional right and (2) must show that the alleged violation was committed by "a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### A.     FOURTH AMENDMENT: EXCESSIVE FORCE

Defendants argue that Officer Cuevas did not use excessive force given Mr. Brown's aggressive behavior and strangulation of Officer Cuevas. (Mot. Summ. J. 12:11–15:25).  In response, Plaintiffs assert that Officer Cuevas's use of deadly force was unreasonable because Mr. Brown was unarmed, and other less intrusive means of force were available to the officers. (Resp. 12:12–19:6).

Excessive force claims are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham*, 490 U.S. at 395.  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015) (internal quotation marks and citations omitted).

In assessing the reasonableness of force used, the Ninth Circuit examines the totality of the circumstances. *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir 2011).  In *Graham*, the Supreme Court laid out three primary factors to evaluate the government's interest in the use of force, known as the *Graham* factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (citing *Graham*, 490 U.S. at 396).  Additional factors include whether the officer gave the suspect warning or could have used less intrusive means of force. *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017).  Courts assess the reasonableness of an officer's conduct "from the perspective of a reasonable officer on the scene," recognizing that officers may be "forced to make split-second judgments" under stressful and dangerous conditions. *Graham*, 490 U.S. at 396–97.

The Court discusses these factors below and concludes that a genuine dispute of material fact remains as to whether Office Cuevas's use of a firearm, in response to Mr. Brown strangling him, was reasonable.

### 1. Severity of the Crime

The severity of the crime weighs in favor of Defendants.  This *Graham* factor refers to the initial criminal activity that led to police involvement, *see Lowry*, 858 F.3d at 1257–58 (analyzing severity of burglary and attempted burglary because police responded to triggered burglar alarm), but a suspect's actions upon police arrival may increase the severity of the crime, *see Conatser v. City of North Las Vegas*, No. 2:06-cv-01236-PMP-LRL, 2009 WL 10679150 at *6 (D. Nev. Nov. 9, 2009) (noting that severity of crime would increase if defendant disobeyed officer commands or attacked officers).

The underlying facts of this case are similar to the underlying facts of *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005).  In *Smith*, a woman called 911 to report a domestic violence situation with her husband, the suspect. *Smith*, 394 F.3d at 702.  The woman, like Mrs. Moore-Brown here, informed the police that the suspect had no guns or weapons. *Id.*  And, just as the officers here could discern that Mr. Brown was unarmed from his lack of shirt and empty waistband, the officers in *Smith* could confirm that the suspect in that case was unarmed because he was clad in his pajamas. *Id.* at 703.  The suspect also did not cooperate with orders from officers before the officers used force, *id.* at 694, but that is where the similarities to the case at hand end.  The suspect in *Smith* never attacked or otherwise physically engaged with the officers. *Id.*  The Ninth Circuit, though "mindful of the seriousness and reprehensibility of domestic abuse," determined that "the circumstances [were] not such . . . as to warrant the conclusion that [the suspect] was a particularly dangerous criminal or that his offense was especially egregious." *Id.* at 702.

This language regarding domestic abuse notwithstanding, the Ninth Circuit has opined on the "volatility of situations involving domestic violence." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). "When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Id*. (internal quotation marks and citation omitted). And unlike the suspect in *Smith*, Mr. Brown became physically aggressive towards the officers without warning, and even put Officer Cuevas in a potentially life-threatening chokehold. As Defendants posit, had Mr. Brown survived the incident, he may have been charged with Battery by Strangulation on a Protected Person in violation of N.R.S. § 200.481.2(c). (Mot. Summ. J. 13:24–28). These facts suggest that the underlying crime—in addition to Mr. Brown's escalation of the situation—was severe, weighing in favor of Defendants.

### 2. Immediate Threat to Safety

The parties mainly dispute the second *Graham* factor, whether Mr. Brown posed an immediate threat to Officer Cuevas's safety. "[T]he 'most important' *Graham* factor is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (quoting *Smith*, 394 F.3d at 702). When considering whether there was an immediate threat to officer safety, a "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Id*. at 441–42 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)).

Mr. Brown clearly posed a threat to officer safety during his encounter with Officer Cuevas and Officer Smith. This is evident by his strength and stature compared to the officers and his aggressive and violent actions. The issue in dispute is whether Mr. Brown remained a threat when Officer Cuevas shot him. Defendants argue that when Mr. Brown released his

choke hold on Officer Cuevas, he remained an immediate threat because he could initiate another attack. (Mot. Summ. J. 15:2–10).  Plaintiffs argue that when Mr. Brown released Officer Cuevas, he was attempting to surrender. (Resp. 15:11–14).  The entire incident, from initial contact with Mr. Brown to shots fired, happened in just over one minute, and Officer Cuevas shot Mr. Brown almost immediately after escaping Mr. Brown's grasp. (Ex. B to Mot. Summ. J. 33:30–34:45).  In that split second, it appears that Mr. Brown could have been stepping back and putting his hands up.  Indeed, at least one of the bullets entered Mr. Brown's back, suggesting that Mr. Brown may have been turning away from Officer Cuevas. (Resp. Ex. G at 4).  Drawing all inferences in favor of the nonmoving party, a reasonable jury could conclude that Mr. Brown was surrendering.  Whether Mr. Brown remained an immediate threat at the time of the shooting is a material fact in dispute.

### 3.  Actively Resisting Arrest

Similarly, a dispute of material fact remains regarding the third *Graham* factor.  The officers never told Mr. Brown he was under arrest. (*See* Ex. B to Mot. Summ. J. 33:30–34:45).  Nonetheless, Plaintiffs concede that Mr. Brown was resisting arrest inside the apartment. (Resp. 17:4).  But as explained above, it is unclear whether Mr. Brown continued resisting arrest after releasing Officer Cuevas; a reasonable jury could conclude that Mr. Brown was surrendering.  Whether Mr. Brown was actively resisting arrest at the time of the shooting is a material fact in dispute.

### 4.  Additional Factors

Other factors further demonstrate that this issue is not fit for summary judgment.  The BWC footage does not show that Officer Cuevas gave any warning—or could give any warning—before shooting Mr. Brown.  Additionally, whether the officers could have used less intrusive means remains a material fact in dispute.  Though the Court does not diminish the severity of Mr. Brown's chokehold on Officer Cuevas or the danger the officers faced in this

situation, it is not clear as a matter of law that three gunshots at close range was a reasonable response to an unarmed attacker who may have been surrendering.

In sum, despite the severity of the crime and the threat to officer safety, issues of material fact remain regarding the Fourth Amendment claim.  The Court denies Defendants' Motion on this claim.

## B.  FOURTEENTH AMENDMENT: SUBSTANTIVE DUE PROCESS

Plaintiffs allege that Officer Cuevas deprived their rights to familial association in violation of the Fourteenth Amendment.  The Ninth Circuit has clarified the "standard of culpability for a due process right to familial association claim," noting that "only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Cnty. Of Sacramento Lewis*, 523 U.S. 833, 846 (1998)).  Two standards exist to determine whether specific conduct "shocks the conscience:" (1) deliberate indifference or (2) purpose to harm. *Id.*  Which standard applies depends on the time frame involved and "whether the officers had the opportunity for actual deliberation." *Id.* at 1138.  When situations "escalate so quickly that the officer must make a snap judgment," courts apply the purpose to harm standard. *Id.*

Here, the entire interaction between Mr. Brown and the officers took place in under one and a half minutes. (*See* Ex. B to Mot. Summ. J. 33:30–34:45); *Cf. Porter*, 546 F.3d at 1138 (applying purpose to harm standard when approximately five-minute altercation ending in police-involved shooting was fast-paced and quickly evolving due to suspect's evasive actions). Officer Cuevas made a snap judgment after he was held in a choke hold.  Thus, the purpose to harm standard applies.

Under this standard, "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Moreland v. Las Vegas Metro. Police Dep't.*, 159 F.3d 365, 372 (9th

Cir. 1998). For example, force "shocks the conscience" under this standard "where force against a suspect is meant only to 'teach him a lesson' or to 'get even.'" *Porter*, 546 F.3d at 1140 (quoting *Davis v. Township of Hillside*, 190 F.3d 167, 173 (3rd Cir. 1999) (McKee, J., concurring)). Conversely, "an officer [does] not act with purpose to harm where the officer believe[s] he [is] 'responding to an emergency.'" *Id.* at 1141 (quoting *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008)) (emphasis omitted).

Defendants argue that "Officer Cuevas did not act with deliberate indifference after being nearly strangled to death by an assailant who instigated a fight against the police, nor was he acting outside the scope of his duties in defending himself and his fellow officer from further attack." (Mot. Summ. J. 16:20–25). In doing so, Defendants demonstrate that there is no dispute of material fact because Plaintiffs provide no factual basis on which intent to harm could be found. Rather, in their Response to the Motion, Plaintiffs restate what Mr. Brown was doing or not doing in the moments leading up to the shooting. (Resp. 19:24–20:6). The decedent's actions do not, as Plaintiffs purport, "raise[] a genuine dispute about Cuevas's motive in killing" Mr. Brown. (*Id.*). Because Plaintiffs bear the burden of proof at trial, Plaintiffs must put forth facts on which a reasonable jury could find that Officer Cuevas acted with a purpose to harm unrelated to the legitimate object of arrest. Plaintiffs fail to assert any facts relating to Officer Cuevas's intent in their Complaint or Response. As a result, the Court grants summary judgment for Defendants on the Fourteenth Amendment claim.

### C. MUNICIPAL LIABILITY

Plaintiffs can sue municipalities directly under § 1983 for violations of constitutional rights. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A litigant may recover from a municipality under § 1983 on one of three theories of municipal liability. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). "First, a local government may be held liable 'when implementation of its official policies or established

customs inflicts the constitutional injury.'" *Id.* (quoting *Monell*, 436 U.S. at 708 (Powell, J. concurring)).  "Second, under certain circumstances, a local government may be held liable under § 1983 for acts of 'omission,' when such omissions amount to the local government's own official policy." *Id.*  "Third, a local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Id.* at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)).  These three theories are sometimes referred to as (1) commission, (2) omission, and (3) ratification, respectively. *See White v. Las Vegas Metro. Police Dep't*, No. 2:19-cv-00386-GMN-NJK, 2021 WL 1109348, at *3 (D. Nev. Mar. 22, 2021).

In order to withstand summary judgment in a § 1983 claim against a municipal entity, also known as a *Monell* claim, a plaintiff must offer enough evidence to create a genuine issue of material fact as to both the existence of a constitutional violation and municipal responsibility for that violation. *See Monell*, 436 U.S. at 690–91.  Plaintiffs allege *Monell* claims against the City and the NLVPD under each of the three theories of municipal liability. (*See* Compl. ¶¶ 55–95). (alleging liability for police custom and policy, failure to train officers, and ratification).  Setting aside the issue of whether a constitutional violation exists here, none of these allegations contain any factual support or rise above the level of conclusory recitations of the three theories.  Moreover, Plaintiffs' Response to the Motion for Summary Judgment failed to present sufficient evidence establishing their *Monell* claims under a theory of commission, omission, or ratification; in fact, Plaintiffs' Response does not address their *Monell* claims at all.

Plaintiffs have the burden of proving their *Monell* claims at trial.  As the moving party, Defendants met their burden by demonstrating that Plaintiffs failed to make a showing sufficient to establish an element essential to their case.  Other than Plaintiffs' mere allegations

surrounding the factual circumstances in their Complaint, Plaintiffs provide no evidence of the formal or informal existence of any allegedly unconstitutional policies. *See Gillette*, 979 F.2d at 1349 (plaintiffs may attempt to prove the existence of an informal policy with "evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded"). Plaintiffs further fail to present any evidence regarding crucial elements of their allegations, such as the duration of the alleged policies or that any official helped to formulate or was even aware of the alleged policies. *Id.* (upholding summary judgment on a *Monell* claim because plaintiff failed to present "any evidence as to how long this alleged informal policy existed," or "that the City Manager or the City Council helped formulate or were aware that any such informal policy existed").

Additionally, Plaintiffs fail to show that the alleged violation occurred as a result of inadequate training on the part of the municipality. *Herrera v. Las Vegas Metro. Police Dept.*, 298 F. Supp. 2d 1043, 1052 (D. Nev. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). "In order to establish a claim under § 1983 due to inadequate training, the Plaintiffs must provide evidence from which a reasonable jury could find that there was an inadequate training program, and that the Defendant was deliberately indifferent to whether its officers received adequate training." *Id.* The inadequate training must have "actually caused" the deprivation of the plaintiff's rights. *Merritt v. Cnty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989) (quoting *Harris*, 489 U.S. at 391). Here, Plaintiffs allege that NLVPD fails to properly train its officers in their Complaint, but they do not allege any facts or provide any evidence regarding the officers' training. (Compl. ¶¶ 70–76). And Plaintiffs failed to respond to Defendants' evidence or argument on municipal liability at all. (*See generally* Resp.). Thus, Plaintiffs offer no evidence from which a reasonable jury could find that there was an inadequate training program or that the NLVPD was deliberately indifferent to whether their officers received adequate training.

Lastly, Plaintiffs fail to establish that "authorized policymakers approve a subordinate's decision and the basis for it." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004) (quoting *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)).  Because Defendants' Motion for Summary Judgment demonstrates that Plaintiffs failed to make a showing sufficient to establish municipal liability, and Plaintiffs did not respond, no issue of material fact remains on Claims 3, 4, and 5.  As such, the Court grants Defendants' Motion for Summary Judgment on the municipal liability claims.

### D. QUALIFIED IMMUNITY

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Thus, to overcome a claim of immunity, Plaintiffs must plead "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  A right is "clearly established" when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 741 (cleaned up).

As discussed above, whether Officer Cuevas violated Mr. Brown's rights remains a material fact in dispute.  Although "[c]ase law has clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others," *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010), whether Mr. Brown posed an immediate threat to the officers is not an issue the Court can decide on summary judgment.  Accordingly, the Court denies Defendants' motion for summary judgment on qualified immunity.

### E.  WRONGFUL DEATH: BATTERY AND NEGLIGENCE

"Under Nevada law, a decedent's heirs and personal representatives may bring a claim against any person who caused the death by 'wrongful act or neglect.'" *Neal–Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1170, 1192–93 (D. Nev. 2008) (quoting N.R.S. § 41.085).  In Nevada, an employer may be held liable for negligent and intentional torts of its employees under a theory of respondeat superior. *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-cv-1340-GMN-NJK, 2016 WL 1169447, at *7 (D. Nev. March 22, 2016).  But "[w]ithout wrongfulness of the employee, there can be no employer liability under respondeat superior." *Id.*

Plaintiffs allege wrongful death under theories of battery and negligence. (Compl. ¶¶19–26).  To state a battery claim, a plaintiff must demonstrate that the defendant: "(1) intended to cause harmful or offensive contact, and (2) such contact did occur." *Burns v. Mayer*, 175 F. Supp. 2d 1259, 1269 (D. Nev. 2001) (citing Restatement (Second) of Torts §§ 13, 18 (1965)). In Nevada, police officers are privileged to use the amount of force reasonably necessary. *See Yada v. Simpson*, 913 P.2d 1261, 1262 (Nev. 1996), *superseded by statute on other grounds as recognized by RTTC Commc'n, LLC v. Saratoga Flier, Inc.*, 110 P.3d 24, 29 (Nev. 2005). Officers are "liable for battery to the extent they use more force than is reasonably necessary." *Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996) (applying Nevada law); *see Yada*, 913 P.2d at 1262.

As discussed above, a dispute of material fact exists as to whether Officer Cuevas's use of force was reasonable.  Thus, Plaintiffs' wrongful death claim based on a theory of battery must survive summary judgment.

To state a negligence claim, a plaintiff must show: "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the plaintiff's injury; and (4) the plaintiff suffered damages." *Scialabba v. Brandise Constr. Co.*,

*Inc.*, 921 P.2d 928, 930 (Nev. 1996).  "Whether a defendant owes a plaintiff a duty of care is a question of law." *Id.*  "Police officers unquestionably owe a duty of care to the general public." *Vasquez-Brenes v. Las Vegas Metro. Police Dep't*, 51 F. Supp. 3d 999, 1014 (D. Nev 2014), *reversed on other grounds by Vasquez-Brenes v. Las Vegas Metro. Police Dep't*, 670 Fed. App'x 617 (9th Cir. 2016).

In their Motion for Summary Judgment, Defendants argue that "Plaintiffs can offer no evidence that any City of North Las Vegas Defendant breached any duty of care owed to them." (Mot. Summ. J. 28:12–13).  But as Plaintiffs state in their Response, "genuine issues of material fact exist regarding whether Cuevas properly and adequately assessed the [] use of force against Decedent." (Resp. 29:13–15).  And if Officer Cuevas was negligent, then the City and NLVPD Defendants could be vicariously liable.  As a result, Plaintiffs' wrongful death claim based on a theory of negligence survives as well.

## F.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

"A bystander who witnesses an accident may recover for emotional distress in certain limited situations." *Grotts v. Zahner*, 989 P.2d 415, 416 (Nev. 1999).  "To recover, the witness-plaintiff must prove that he or she (1) was located near the scene; (2) was emotionally injured by the contemporaneous sensory observance of the accident; and (3) was closely related to the victim." *Id.*

As with the negligence claim, Defendants contend "Plaintiffs can offer no evidence that any City of North Las Vegas Defendant breached any duty of care owed to them." (Mot. Summ. J. 28:12–13).  Because Plaintiffs' negligence claim remains alive, Defendants' reliance on the linkage between negligent infliction and negligence fails to negate any element of the former.  Accordingly, burden shifting is unwarranted, and the claim survives.

## G. DISCRETIONARY IMMUNITY

Under Nevada's discretionary-function immunity statute, "no action may be brought" against a public officer "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." N.R.S. § 41.032.  Nevada courts expressly rely upon case law interpreting the Federal Tort Claims Act ("FTCA") for guidance on state discretionary immunity. *Martinez v. Maruszczak*, 168 P.3d 720, 727 (Nev. 2007).  Borrowing from the FTCA, Nevada has adopted a two-part test to determine whether government officials are entitled to discretionary immunity. *Id.* at 728.

A decision is entitled to discretionary immunity under N.R.S. § 41.032 if the decision "(1) involve[s] an element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." *Id.* at 729.  In analyzing discretionary immunity, courts "must assess cases on their facts, keeping in mind Congress' purpose in enacting the exception: to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* (internal quotation marks omitted).

"[W]here an officer's actions are 'attributable to bad faith, immunity does not apply whether an act is discretionary or not.'" *Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007) (quoting *Falline v. GNLV Corp.*, 823 P.2d 888, 891 (Nev. 1991)).  Under this rationale, N.R.S. § 41.032 does not shield government actors from liability for intentional torts. *Franchise Tax Bd. of State of California v. Hyatt*, 407 P.3d 717, 733 (Nev. 2017).  Similarly, governmental officials "do not possess discretion to violate constitutional rights." *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004); *see also Nurse v. United States*, 226 F.3d 996, 1002 n.2 (9th Cir. 2000) ("[T]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply.").

Given the disputed issues of fact in this case, the Court cannot determine as a matter of law that Officer Cuevas's conduct evinced an absence of bad faith. Because Plaintiffs' Fourth Amendment and wrongful death based on the intentional tort of battery claims survive, Officer Cuevas is not entitled to discretionary immunity at this stage. The Court denies Defendants' Motion on this defense.

## H. PUNITIVE DAMAGES

Under Nevada law, punitive damages are available "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied." N.R.S. § 42.005(1); *Union Pac. R.R. Co. v. Winecup Ranch*, No. 3:17-cv-00477-LRH-CLB, 2020 WL 7125918, at *24 (D. Nev. Dec. 4, 2020). "'Malice, express or implied' means conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others." N.R.S. § 42.001(3). "'Conscious disregard' means the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences." *Id.* § 42.001(1). Because "[conscious disregard] plainly requires evidence that a defendant acted with a culpable state of mind, . . . at a minimum, [it] must exceed mere recklessness or gross negligence." *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 255 (Nev. 2008). For example, in *Madrigal v. Treasure Island Corp*, the district court recognized that evidence beyond mere negligence such as "unusual and serious circumstances of oppression, hardship, and injury" must exist to support a punitive damages award. *Madrigal*, No. 2:08-cv-01243-PMP-GWF, 2008 WL 11389168, at *4 (D. Nev. Dec. 30, 2008) (quoting *Forrester v. Southern Pac. Co.*, 134 P. 753, 769 (Nev. 1913)).

Punitive damages are recoverable in a § 1983 action "when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (quoting

*Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir. 1993)).  Punitive damages may be awarded if there is a finding that a defendant's conduct:

> was malicious, oppressive or in reckless disregard of the plaintiff's rights. Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring another. Conduct is in reckless disregard of the plaintiffs rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety or rights, or the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law. An act or omission is oppressive if the person who [performs] [fails to perform] it injures or damages or otherwise violates the rights of the plaintiff with unnecessary harshness or severity, such as by the misuse or abuse of authority or power or by the taking advantage of some weakness or disability or misfortune of the plaintiff.

Model. Civ. Jury Instr. 9th Cir. 5.5 (2007); *see also Dang*, 422 F.3d at 807–08 (concluding that punitive damages are appropriate in § 1983 cases where there is a finding of "malicious, wanton, or oppressive acts or omissions").

The Court has determined that material factual issues exist regarding whether Officer Cuevas used excessive force in violation of the Fourth Amendment.  Additionally, the Court has determined that material factual issues exist regarding whether the Defendants are liable for state tort claims, including an intentional tort.  Nonetheless, Defendants met their initial burden for summary judgment on punitive damages by demonstrating that the nonmoving party failed to make a showing sufficient to establish that Officer Cuevas's conduct was malicious, oppressive, or in reckless disregard of Plaintiffs' rights.  The burden thus shifts to Plaintiffs to establish that a genuine issue of material fact exists.

Although Plaintiffs' Response does not directly address punitive damages by listing specific evidence to meet its burden to show "malice, oppression, or reckless disregard," Plaintiffs did provide expert opinion about the factual evidence in the Response. (Resp. 11:8–12:11).  The police practices expert opined that the failure to use less-lethal force was in reckless disregard of life. (*Id.*; *see also* Ex. H to Resp. at 18).  Based on the expert's opinions

provided in Exhibit H to the Response, Plaintiffs met their burden of showing a dispute of material fact.  Thus, the Court denies summary judgment on the issue of punitive damages.

## IV.   <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 27), is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that within twenty-one days of the entry of this Order, the parties shall file a Proposed Joint Pretrial Order.

**DATED** this __3__ day of __Oct__, 2022.

_____
Gloria M. Navarro, District Judge
United States District Court